# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **SFA SYSTEMS, LLC** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| | § | **CASE NO. 6:09-CV-340** |
| **vs.** | § | **PATENT CASE** |
| | § | |
| **1-800-FLOWERS.COM, INC., et al** | § | |
| | § | |
| **Defendants.** | | |

| | | |
|---|---|---|
| **SFA SYSTEMS, LLC** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **CASE NO. 6:10-CV-300** |
| **vs.** | § | **PATENT CASE** |
| | § | |
| | § | |
| **BIGMACHINES, INC., ET AL.** | § | |
| | § | |
| **Defendants.** | | |

## MEMORANDUM OPINION AND ORDER

This case was referred for claim construction only. This opinion construes the terms in United States Patent No. 6,067,525 (the "'525 patent"). Also before the Court is Defendants' Motion to Strike Undisclosed Evidence from SFA's P.R. 4-5(c) Brief (Docket No. 274), which the Court **DENIES**.

## BACKGROUND

SFA asserts both method and systems claims from the '525 patent. The '525 patent is directed to a sales force automation system that integrates intelligent, automated salesperson

support for multiple phases of the sales process. '525 patent, Abstract. The invention is intended to intelligently integrate into a single system tools used by a sales person in the sales process. *Id.* at 1:8–9. Generally, the invention is facilitated on a computer system and involves a number of subsystems that correspond to phases in the sales process along with an event manager. The computer detects the occurrence of an event and initiates an operation in another subsystem to facilitate a new event in the sales process based on the context of the first event. *See id.* at 2:21–55. This patent was previously construed in *SFA Systems, LLC v. Infor Global Solutions (Michigan), Inc.*, 6:07cv67, Docket No. 211, 2009 WL 440559 (E.D. Tex. Feb. 23, 2009) (Davis, J.).

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of

particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also

define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

## ANALYSIS

### "Sales process"

SFA contends this term should be construed as "the process of selling goods or services, which may include, but is not limited to, generating a lead, completing a sale, managing an order, retaining a customer, or any other interaction with a customer throughout this process." Defendants contend the term means "the lead generation, time with customer, order management, and customer retention phases of selling." The parties' primary dispute is whether the term "sales process" requires all of the four particular "phases" of the disclosed embodiment.

SFA argues the claim language does not require every phase (i.e. all four disclosed

phases) as Defendants propose. Docket No. 107 at p. 8-9. To support its position, SFA first points to the claim language noting, for example, that the relevant claims call for facilitating actions performed "during at least one phase of the sales process." *Id.* at p. 8. SFA also argues a claim differentiation theory based upon dependent claims 5–12, which expressly "enumerate specific subsystems that *must* be involved in the claimed system." *Id.* at 9. SFA reasons that since particular subsystems correspond to various phases in the sales process, the independent claims should not be read to require facilitation of every phase of a sales process. *Id.* at 9–10. SFA contends the specification supports its interpretation and the applicant's statements during prosecution do not contradict this view. *Id.* at 10–11.

Defendants contend that the invention is described in the specification as a system or method that integrates *all* phases of the sales process. Response at p. 15–16. Defendants further contend that the claim language requires that each of the plurality of subsystems corresponds to at least one phase of the sales process and the preamble refers to the sales process rather than merely one phase of the sales process. *Id.* at 15. Defendants argue that during prosecution the applicant distinguished the prior art as addressing a particular event or only a small subset of tasks. *Id.* at 15–16. In sum, Defendants argue that the sales process must include all four named phases.

The Court construes "sales process" as "a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention." The Court declines to use SFA's proposed phrase, "which may include, but is not limited to," because it conveys no useful meaning for the fact finder. Under SFA's construction, each of the four phases may or may not be included in the sales process and little else is required. Thus, SFA's construction is merely a simple restatement of the claim

term—"the process of selling goods or services."  The remainder of its proposed construction does not limit the term or provide guidance to its meaning.

The Court agrees with Defendants that more than one phase is necessary in the claimed sales process.  However, all four phases are not required to be included.  The Abstract describes the invention as "integrat[ing] . . . *multiple* phases of the sales process."  The Background of the Invention distinguishes the prior art systems that addressed only part of the sales process.  After describing the various different components, the specification teaches that "each of the above described components may not be needed in a particular sales environment. . . . What is particularly advantageous, however, is that each of the components used in a particular sales system be fully integrated into a system which allows for a common exchange of relevant information between the various components used."  '525 patent at 7:44–53.  Thus, the specification contemplates that not all components will be used in every system, but the purpose of the system is to fully integrate at least two components.

Furthermore, the Court has examined the portions of the file history cited by Defendants, and there are no clear arguments over the prior art (e.g. Negrino) that would require defining the "sales process" to include all four disclosed phases.  Moreover, the claims themselves are broadly drafted.  They do not require particular phases of the sales process or subsystems that must be included.  Thus, whether two or more accused sales "phases" satisfy the claim limitation is a fact question for the jury. Accordingly, the Court construes "sales process" as "a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention."  While the Court's construction identifies exemplar phases to assist the jury in identifying a "phase," a sales process is not limited to these particular phases.

**"event occurring within the system"/ "event occurring in the system"**

SFA contends these terms do not require construction. Alternatively, SFA argues they mean "any identifiable occurrence or happening, or lack thereof, which has significance for system hardware or software." Defendants contend the terms mean "a hardware or software operation that has occurred internal to the system."

SFA argues that the specification describes "application events" and "sales events." Docket No. 107 at 14 (citing '525 patent at 30:34–61). Based on this part of the specification, SFA contends an event occurring within the system is anything that occurs within the system that has some significance for the system hardware or software. It may be an operation performed by the system or the system's use of information to initiate another event. *Id.* at 14–15. Additionally, SFA cites Figures 21A-21E to argue that the lack of an "occurrence or happening" can also be an event.

Defendants contend that the proper construction of these terms (and the additional term "event occurring in the sales process") must incorporate the distinction between "sales events" and "application events." Response at 17 (citing '525 patent at 30:34–61). Defendants argue that SFA's proposed construction is improper because: it eliminates the express claim language requiring the event to occur "within" the system; it does not limit the event to a hardware or software operation; and it includes non-events such as the lack of an "occurrence or happening."

The Court construes "event occurring within the system" and "event occurring in the system" as "an operation of the software or hardware making up the sales system." The invention is intended to integrate a real-life sales process with events occurring in a computerized system. *See* '525 patent, Abstract ("A salesforce automation system which integrates computerized, intelligent automated salesperson support for multiple phases of the

7

sales process."). Events occurring within the *system* are distinct from events occurring in the *sales process* because the system is "computerized" and the "sales process" is real-world activity. *Id*. at 30:36–41 ("a sales event may be an event in the sales process, typically occurring between the salesperson and the customer, while an application event may be an internal operation of the sales system (i.e., the operation of the software and hardware making up the sales system) which is used to electronically facilitate the sales event").

The specification clearly teaches that there are two kinds of events: sales events that occur during the real-life sales process and application events that occur within the claimed computerized system. These two disclosed event types clearly correspond to the two claimed event types that are respectively, events occurring in the sales process and events occurring within/in the system. The specification supports this distinction, and the use of differing claim words bolsters that support. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119–20 (Fed. Cir. 2004) ("[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms."). As a result, the Court cannot agree with SFA that the two types of events are the same. Any confusion between the terms results from the patentee's intentional failure to always distinguish between the two types of events:

> As can be appreciated, in many instances a sales event and its related application event may be used interchangeably to describe an event. In the discussion below, where a distinction between the two types of events is useful, the terms sales event and application event are used. Where the discussion applies more generally to both types of events the term event may be used in a more generic form.

'525 patent at 30:59–65. Although the patent does not always clearly distinguish between the two event types, the Court's construction makes clear that events occurring in the system are not

8

real-life sales events.  Furthermore, as discussed below, while the "lack of a happening" may be an event occurring during the sales *process*, events within the *system* do not encompass a "lack of happening" or inaction.  Accordingly, the Court construes "event occurring within the system" and "event occurring in the system" as "an operation of the software or hardware making up the sales system."

**"event occurring in the sales process"**

This term is used in Claim 20.  SFA contends the term does not require construction or alternatively should be construed as "any identifiable occurrence or happening, or lack thereof, which is part of the sales process."  Defendants originally proposed the term be construed as "a salesperson's action that has occurred external to the sales system" and then alternatively proposed "an action or inaction between a sales person and a customer that has occurred external to the sales system."

SFA argues the claim language does not limit who is responsible for causing the event to occur. Docket No. 107 at 17.  SFA further contends the written description contains several examples where the customer initiates the event:

> For example, the events depicted in Figure 21A include "[a] customer contacts an Internet Web-Site to get product information," and "[a] customer uses a kiosk to gain information on a product or service and request[s] follow-up call from company representative." The events depicted in Figure 21D include "[c]ustomer directly contacts the manufacturer regarding a product problem," "[c]ustomer brings the product in [to] the dealer for service," and "customer approves the proposal and signs the order." The events depicted in Figure 21E include "[c]ustomer requests to know delivery date for product . . . ." The written description itself contains several examples of an event occurring during the sales process initiated by a customer or someone other than a "salesperson."

*Id*.  SFA also argues that the patent does not limit events "occurring in the sales process" to events external to the sales system.  *Id.* at 17–18.

9

In light of some of SFA's arguments, Defendants proposed a compromise construction: "an action or inaction between a sales person and a customer that has occurred external to the sales system." Defendants contend that sales events are events in the sales process and application events are internal operations of the sales system.

Notwithstanding Defendant's compromise proposal, the parties still disagree regarding: whether the event is necessarily a salesperson's action; whether the event must be between a salesperson and a customer; and whether an event in the sales process includes an inaction. The specification is clear that events occurring in the sales process are not limited to actions or inactions occurring between the sales person and customer. Figures 21A through 21E list many events that involve only a customer or a salesperson. *See, e.g.*, Fig.21A ("d) A customer contacts an Internet Web-site to get product information"). Furthermore, while events within the *system* cannot include inaction, events in the sales *process* may include inaction. As suggested by SFA, Figure 21A describes an event where a "[s]alesperson fails to make any initial contact or follow-up to a qualified lead." Further, Figure 21B describes an event where "[a] salesperson frequently fails to offer creative finance options when proposing a finance payment for a product purchase." These "inactions" are the non-occurrence of predetermined or expected events that are known to the "sales system." The parties are instructed to conform their trial arguments to this understanding of "inaction." Without such an understanding, anything under the sun (or the lack thereof) might satisfy the claim limitation.

Finally, the parties also dispute whether events occurring in the sales process are distinct from events occurring in the system. As explained above, there is such a distinction. Accordingly, the Court construes "event occurring in the sales process" as "a real-life action or inaction that occurs in the sales process."

**"A computer implemented sales system used to facilitate a sales process, the system comprising . . ."/ "facilitating a sales process using a computer arrangement "**

These terms are used in the claims' preambles.  SFA contends the claim preambles are not claim limitations, except to the extent "a computer implemented sales system" is the antecedent reference for "the computer" used in the body of claim 1 and "a sales process" is the antecedent basis for "the sales process" used in the body of claims 1 and 40.  Docket No. 107 at 4–5.

Defendants contend the preambles are limiting because they describe the central characteristic of the claimed inventions.  Defendants argue that the term "a computer implemented sales system used to facilitate a sales process" means "a computer providing salesperson support during a sales process."  Defendants also contend that the term "facilitate a sales process using a computer arrangement" means "using a computer providing salesperson support during a sales process."  Defendants argue that their proposals are consistent with SFA's position in the previous litigation and the intrinsic evidence.  The parties have two central disputes regarding these terms.  First, the parties disagree regarding whether the preambles are limiting at all.  Second, if the preambles are limiting, the parties disagree regarding whether or how to fashion a construction.

Generally, a preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *Eaton Corp. v. Rockwell Int'l Corp.,* 323 F.3d 1332, 1339 (Fed. Cir. 2003); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).  When the patentee defines the invention using both the preamble and the claim body, the preamble is a claim element and therefore a limitation.  *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995).

Additionally, when limitations in the claim body rely on and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention. *See, e.g., Electro Sci. Indus. v. Dynamic Details, Inc.*, 307 F.3d 1343, 1348 (Fed. Cir. 2002). However, if the body of the claim sets out the complete invention, then the language of the preamble may be superfluous. *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310 (Fed. Cir. 2002).

Here, the preambles in question each provide antecedent basis for the "sales process" as well as the computer (claim 1). Furthermore, the preambles are necessary to give life, meaning, and vitality to the claims. *See Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010) (citing *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). In particular, the preambles materially define the relationship between the "sales *process*" and the computer *system*. The differences in the claims highlight the importance of the preambles. In the body of claim 1, the claimed "changes in state" are characteristic of an event occurring within the *system*, where "the system" is a reference back to the preamble's "computer implemented sales system." By contrast, in claim 20, the changes in state are "characteristic of an event occurring in the sales *process*," where the "sales process" is a reference back to the sales process of the preamble. Thus, the preambles provide important juxtaposition for the "sales process" and the computer "system." This provides essential context for understanding how various claims differ. Thus, the preambles breathe life into the claims. Accordingly, the preambles are limiting in their entirety and not merely the individual words that serve as antecedent basis.

Although the preambles are limiting, they do not require construction. Defendants seek to limit the claims to require a salesperson. Defendants' proposed constructions are not

warranted based on the claims or specification. While the specification does describe using the claimed systems and methods to assist a salesperson, it does not do so to the exclusion of other potential embodiments. Furthermore, a salesperson is not literally required by the claims, and there is no reason to import such a limitation.

Defendants also argue SFA's papers in a prior litigation support Defendants' position. Response at 12. However, Defendants have not put forth a legal theory (e.g., estoppel) that would confine this Court or bind SFA with respect to the cited prior statements. Nevertheless, the Court has examined the statements, and they do not justify a construction departing from the literal claim words. Defendants' citations refer to two discrete portions of a summary judgment response filed by SFA to defend validity of the '525 patent. The first two citations are excerpts from SFA's argument to support patentability over the "Filepp" reference:

> The Filepp '632 Patent ("Filepp") does not anticipate Claims 1, 20, or 40 of the patent-in-suit. Because these Claims have common limitations, we address them together. Although Defendant failed to dispute one element of Claim 40, for the sake of completeness, this limitation is addressed below.
>
> Filepp does not disclose the limitation a "sales system used to facilitate a sales process." The Prodigy online subscription service as described in Filepp is a proprietary predecessor of the Web and analogous to web browser servers such that it could possibly be programmed for many purposes. Thompson Report at 56 (Exhibit 2). Filepp, however, does not describe how to program the Prodigy online subscription service for direct sales from salespersons to end–user customers. In Filepp, retail sales or banking transactions were implemented as partitioned applications with only the end-user customer interacting with the systems. Thus, the patent was not directed at helping salespersons. *Id*. at 57. Despite Defendant's attempt to convince the Court otherwise by quoting only a part of one of Dr. Thompson's deposition statements, Dr. Thompson has consistently stated in his report and deposition that Filepp does not disclose the sales system of the patent-in-suit.

Ex. F to Response, *Infor Litigation*, Pl.'s Resp. Mot. Summ. J. Inv. at 4.

Defendants particularly emphasize SFA's argument that "Filepp, however, does not describe how to program the Prodigy online subscription service for direct sales from

salespersons to end–user customers. In Filepp, retail sales or banking transactions were implemented as partitioned applications with only the end-user customer interacting with the systems. Thus, the patent was not directed at helping salespersons." *Id*. While there is some topical connection between this passage and the current construction issue, the connection is not compelling. SFA primarily distinguished Filepp because "the Prodigy online subscription service as described in Filepp is a proprietary predecessor of the Web and analogous to web browser servers such that it could possibly be programmed for many purposes." The further arguments involving salespersons may be merely exemplary when read in the context of the prior litigation situation. Those earlier arguments by SFA did not concern whether the claims were *confined* to salesperson interaction. In other words, SFA did not argue that the claims *only* cover salesperson interaction. SFA argued in the context of validity stating that Filepp does not disclose salesperson interaction—an embodiment that is undisputedly covered by the claims. The question now before the Court is whether the claims are confined by a doctrine that justifies departure from the ordinary meaning of the claim words. The cited excerpts from the prior litigation do not provide that justification, particularly given the absence of any application of those excerpts to an appropriate legal doctrine.

Defendants also cite SFA's statement that "Further, there is a presumption in the '525 Patent that the system is aiding a salesperson who is part of a sales force." *Id*. at 15. However, the statement in the excerpt is qualified with a footnote stating: "while the sales person is using the time with customer component 104." *Id*. Thus, SFA was emphasizing that the argued "presumption" only applied to the patent's "time with customer" component. Therefore, as with the other cited excerpts, this excerpt does not relate to the boundary of the claims' meaning so it has little bearing on the current dispute. Moreover, SFA's qualification in the footnote more

14

broadly contradicts any notion that it was arguing to confine the claims with respect to salespersons. Furthermore, the excerpt is expressly qualified as applying to claims 5, 6 and 7, not claims 1, 20 and 40. Thus, this does not justify Defendants' proposed construction.

Having resolved the parties' disputes and the claim language being sufficiently clear itself, the preambles (while limiting) do not require construction.

**"context"**

In the previous case, the Court adopted the parties' agreed construction: "information already existing within the system that becomes relevant upon the occurrence of an event." SFA argues the Court should adopt the same construction in this case. Defendants contend the term should be construed as "customer-related information already existing within the system that becomes relevant upon the occurrence of an event." Thus, Defendants contend "context" is limited to "customer-based" information.

Defendants contend that "context" has no ordinary meaning in the art and the specification teaches that the system relies and acts on customer-related information. Defendants argue the only example of "context" in the specification is as customer-specific information. *See* '525 patent at 32:59–62. Further, Defendants contend the applicants distinguished the prior art by citing customer-related information:

> The invention recited in Claim 1 would infer the context of sending the letter to the client before scheduling the call. Perhaps the letter was to terminate the relationship with the customer. *The invention in Claim 1 might infer that because this was a termination letter (one type of context),* a follow up call was not necessary, and it would not schedule one. Without inferring the context, the follow up call would be needlessly scheduled, leading to inefficiency. The Negrino system might check to see if a letter has been sent. There are multiple results in that case. If a letter was sent, then a follow up is scheduled (a first result). If no letter was sent, then a follow up is not scheduled (a second result). Other cases might provide more possibilities for results, yet no contextual inferencing would be occurring.

15

Ex. M to Docket No. 260, Oct. 27, 1999 Amendment at 3–4 (emphasis added).

The suggested limitation is not required based upon the cited portion of the file history. Defendants also cite to the specification, which is similarly non persuasive. *See* '525 patent at 32:57–33:4. Finally, the claims themselves indicate a rather broad reading of the term "context." In particular, claims 1 and 40 discuss "context" of an event in the system (e.g. a computer), while claim 20 discusses "context" of an event in the sales process (e.g. a real world event). Accordingly, Defendants' proposed limitation is not appropriate in light of the claims or specification, and the Court does not adopt it.

The Court adopts its previous construction and construes "context" as "information already existing within the system that becomes relevant upon the occurrence of an event."

**"infer[ring] . . . a context"**

The Court previously construed this term as "logical process by which the fact that information already existing within the system that becomes relevant upon the occurrence of an event is derived by application of logical rules." SFA argues the Court should adopt its previous construction in this case. Defendants argue the term should instead be construed as "logical process by which the significance of [customer-related] information already existing within the system is evaluated with respect to the event [by application of logical rules to detect the changes in state]." At the hearing, Defendants alternatively proposed a modified version of its proposed construction that did not include the bracketed language.

Defendants contend this phrase warrants reconsideration because the meaning of the terms as a whole was never briefed or previously considered by the Court. Response at 22. In the previous case, the parties focused on whether the term "infer" was indefinite. Defendants contend the intrinsic and extrinsic evidence supports their construction. Specifically, Defendants

16

contend that during prosecution, the applicants made arguments that are inconsistent with SFA's current proposal and the Court's prior Order. *Id*. at 23. Defendants argue that inferring the context is not a function involving linear processing but based on an intelligent or educated understanding of information surrounding the detected changes in state. *Id*. at 22. Defendants contend they are not merely replacing the world "relevant" with "significant," but instead contend the jury should be instructed that the event manager must evaluate the significance of information already existing within the system with respect to the event, in order to determine what is relevant. Defendants also argue that SFA's current proposed construction would have been insufficient to overcome prior art references cited by the examiner. Finally, Defendants contend the intrinsic evidence does not support SFA's assertion that the step of evaluating the context must come after the context has been inferred.

SFA contends the Court's previous construction is consistent with the parties' agreed construction of "inferring" and the Court's previous construction of "context." SFA argues the Court should again reject Defendants' "customer-related" limitation. SFA further argues that Defendants' use of "evaluating" is inconsistent with the parties' agreed construction of "inferring." SFA also argues the word "relevant" is more accurate than the word "significance." SFA contends that there is no intrinsic support to require that the event manager evaluate the significance of information already existing in the system in order to infer a context in which the event at issue occurred. SFA contends Defendants are attempting to import a limitation from a preferred embodiment.

The Court adopts its previous construction and construes "inferring . . . a context" as "logical process by which the fact that information already existing within the system that becomes relevant upon the occurrence of an event is derived by application of logical rules."

For the reasons already discussed, the Court does not adopt Defendants' "customer-related" proposal. Defendants' proposed language of "detected changes in state" is already included in the claim language so the Court will not address that further. Additionally, including the word "significance" would merely import a word from the specification without lending any clarity. *See* '525 patent at 5:8–12. The Court has reviewed Defendants' submissions closely, and adding the word "significant" will not clarify the construction or otherwise aid the jury. Finally, the prosecution history does not support Defendants' proposal. Every claim requires detecting changes in state that are characteristic of an event and inferring the event and a context, based in part on those changes. To be clear, this requires inferring both the event and context. As Defendants suggest, during prosecution, the applicant distinguished Negrino because Negrino did not infer a context but merely teaches automatic branching. *See* Ex. I to Docket No. 260-9, July 14, 1998 Amendment at 7. Defendants argue that

> the examiner rejected the pending claims as unpatentable over Negrino in part because Negrino disclosed (1) "automated branching . . . based on detecting the outcome characteristics of a prior step" and (2) "automatic logging of [customer-related] information upon occurrence of events."Ex. N, '525 patent, Apr. 7, 1999 Office Action at 6. In response, the applicants argued that "Negrino's steps do not include inferring the context," and "[b]asing a new action upon the context of a previous event . . . is different than automated branching." Ex. M, '525 patent, Oct. 27, 1999 Amendment at 3.

Response at 23–24.

The prosecution history is clear that the argued distinction was that Negrino did not infer a context. There is no further implication from those arguments. Every claim requires inferring a context, and the Court has already defined that term. Accordingly, Defendants' proposed construction is not warranted, and the Court adopts its previous construction.

**"based on the inferred context"**

SFA offers no proposed construction because it contends that this term was not identified as disputed in the parties' Joint Claim Construction Statement. Defendants contend that the term should be construed as "using customer-related information already existing within the system to inform the system as to whether to proceed and what the next step should be," consistent with Defendants' proposal for "inferring . . . a context." As the Court rejected Defendants' proposal for "inferring . . . a context," it rejects Defendants' proposal for this term as well. "Based on the inferred context" relates back to the "inferring . . . a context" term and does not require construction apart from that term.

**Means-plus-function terms**

Defendants contend 35 U.S.C. § 112(6) applies to "plurality of subsystems" and "event manager." Although the terms do not use the word "means," Defendants contend the terms fail to recite sufficiently definite structure and overcome the presumption that § 112(6) does not apply.

Claim limitations that use the word "means" invoke a rebuttable presumption that § 112(6) applies. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002). Conversely, claim limitations that do not use the word "means" raise a rebuttable presumption that § 112(6) does not apply. *Id.* However, limitations that do not use "means" may overcome the presumption that § 112(6) does not apply if the claim fails to recite sufficiently definite structure or recites function without sufficient structure to perform that function. *MIT v. Abacus Software*, 462 F.3d 1334, 1353 (Fed. Cir. 2006). This presumption against means-plus-function treatment for limitations not using the word "means" is a strong presumption that is seldom overcome. *Id.* at 1356. Nonce words, such as mechanism, device, means, or element, typically do not connote sufficient structure to avoid § 112(6). *Id.* at 1354.

**"plurality of subsystems"**

SFA contends "subsystem" should be construed as "a system that is part of a larger system" as the Court previously construed it. SFA contends the remainder of the phrase does not require construction. Defendants contend this term is governed by 35 U.S.C. § 112(6). Defendants contend "subsystem" alone fails to connote sufficient structure to one of skill in the art.

In the context of the '525 patent, a subsystem is part of a computer. This is clear from both the specification and the claims. Claims 1 and 40 state "a computer implemented sales system . . . the system comprising: a plurality of subsystems . . . ." Claim 20 calls for "a method of facilitating a sales process using a computer arrangement having a plurality of subsystems . . . ." There is no doubt that the claims require computer(s) with subsystems. The Abstract describes the system as computerized and including various subsystems. The Summary of the Invention describes the invention as a "computer sales system" that "includes a plurality of subsystems." '525 patent at 2:24–26. Here, the "plurality of subsystems" in the claim language is a clear reference to the preambles' "computer implemented sales system" (claims 1 and 40) and "computer arrangement" (claim 20). Unlike the cases Defendants cite and contrary to their arguments, the term "subsystem" is a clear reference to an earlier-stated computer system and connotes sufficient structure to one of skill in the art to avoid § 112(6) treatment. As a result, the Court's prior construction is accurate. However, the Court amends its prior construction to resolve the dispute between the parties. Therefore, the Court construes "plurality of subsystems" as "system that is part of a larger computer implemented sales system."

**"event manager"**

SFA argues this term is not governed by § 112(6) and should be construed as "hardware and/or software" as it was in the prior litigation. Defendants contend the term is governed by § 112(6). SFA argues that, at the time of the '525 patent, "event manager" had a reasonably well-understood meaning in the art. Defendants contend the term was not a term of art or a term that would connote sufficiently definite structure to those skilled in the art at the time of the '525 patent. Defendants argue that the references SFA cited in its opening brief do not show that an "event manager" was known in the art and SFA's arguments during the previous litigation contradict its arguments here. SFA responds to Defendants' arguments and cites additional sources supporting its position. Defendants move to strike those additional sources (Docket No. 274).

First, contrary to Defendants' arguments, SFA's arguments about "event manager" made here and made during the previous case are not inconsistent. The arguments during the previous case were made in response to a different issue and are not probative here. Second, the Court denies as moot Defendants' motion to strike. As the Court does not rely on the references as issue, the motion is pragmatically moot.

The term "event manager" is clearly not a nonce word that might typically fail to connote sufficient structure and overcome the presumption against § 112(6) treatment. Moreover, the presumption against § 112(6) treatment is strong and only rarely overcome. *MIT*, 462 F.3d at 1356. As the term is not a nonce word, the issue before the Court is whether the term is purely functional or whether it connotes structure. Figures 10A (201A), 10B (201B), 12 (201A), and 13 (201B) show the event manager as a computer module with an API (application programming interface). In addition, the specification treats the event manager as structural: "the system also includes an event manager coupled to . . . ." '525 Patent at 2:29; *see, e.g., id.* at 2:47, 8:22–43.

Thus, the patent clearly treats the event manager as a specific "thing" that would be understood by a skilled artisan. The patent does not discuss the event manager as a coined concept, a function, or a functional result. Furthermore, like the "subsystems" discussed above, the event manager is an expressly claimed part of the claimed computer implemented sales systems. Further, claims 1 and 40 require the event manager to have specific abilities, and in view of the expressly claimed tie to a computer, a skilled artisan would understand the claims alone to indicate that the event manager is structural. Moreover, the additional claim limitations modifying the event manager prevent event manager from reading on "anything under the sun" as Defendants argue. SFA presented sufficient evidence in its opening brief that an event manager would have connoted some structure to one of skill in the art at the time of the '525 patent. Defendants have not overcome the strong presumption against § 112(6) treatment.

As a result, the Court's prior construction is accurate. However, the Court amends its prior construction to resolve the dispute between the parties. Therefore, the Court construes "event manager" as "hardware and or software that is within a computer implemented sales system."

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. For ease of reference, the Court's claim interpretations are set forth in a table as Appendix A.

**So ORDERED and SIGNED this 8th day of August, 2011.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

| Claim Term | Construction |
|---|---|
| A computer implemented sales system used to facilitate a sales process, the system comprising . . ./ facilitating a sales process using a computer arrangement | no construction |
| sales process | a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention |
| event occurring within the system/ event occurring in the system | an operation of the software or hardware making up the sales system |
| event occurring in the sales process | a real-life action or inaction that occurs in the sales process |
| context | information already existing within the system that becomes relevant upon the occurrence of an event |
| infer[ring] . . . a context | logical process by which the fact that information already existing within the system that becomes relevant upon the occurrence of an event is derived by application of logical rules |
| based on the inferred context | no construction |
| plurality of subsystems | system that is part of a larger computer implemented sales system |
| event manager | hardware and or software that is within a computer implemented sales system |